IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JAMES R. O'BRYAN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | 8:06CV446 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendant. | ) | |

This is an action for judicial review of a final decision of the Secretary of Health and Human Services.[1]  James R. O'Bryan appeals a final determination of the Commissioner of the Social Security Administration denying his application for Social Security Disability and Supplemental Security Income benefits under Title II and Title XVI of the Social Security Act.  This court has jurisdiction under 42 U.S.C. § 405(g).

**I.  BACKGROUND**

James R. O'Bryan filed his application for benefits on June 30, 2003, alleging disability beginning on December 7, 2002 due to depression and back pain.  *See* Filing Nos. 9 & 10, Social Security Transcript of Proceedings, Vols. I & II ("Tr.").  His applications were denied initially and on reconsideration.  *Id.* at 29, 34.  On September 6, 2005, following a hearing, an administrative law judge (ALJ) found that O'Bryan was not disabled

---

[1]On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

as defined in the Social Security Act. *Id.* at 9. On April 19, 2006, the Appeals Council of the Social Security Administration denied claimant's request for review. *Id.* at 8-10.

O'Bryan was born in 1962. At the time of the alleged onset of his disability he was forty years old. He had been employed as a maintenance-mechanic supervisor, construction worker, sales manager and metal fabricating supervisor. He has a high-school education. *Id.* at 85. In his application, O'Bryan stated that he could stand for 10-15 minutes and sit for 15-20 minutes without pain. *Id.* at 108. He also stated that he could walk seventy-five yards and could drive a car for 30 to 45 minutes. *Id.* at 108-09. He experienced pain while bending, pulling, grabbing or pushing. *Id.* at 109-10. He could not lift over five pounds. *Id.* at 81. O'Bryan's application also stated that his medication made him drowsy and had side effects such as tremors and shakes. *Id.* at 84, 111. A Social Security Administration examiner noted after an interview that O'Bryan had difficulty sitting, standing and walking, wore a back brace and used a cane and had to get up and walk around several times. *Id.* at 79.

At a hearing before an administrative judge, O'Bryan testified that he had back pain so severe that he could not arise from a chair at times. *Id.* at 309. He stated that he had constant pain in his left leg. *Id.* at 313. He took anti-inflammatory medication and muscle relaxers. *Id.* at 303. He also stated that he took medications for depression, but did not feel the medications worked. *Id.* at 308. He also testified that injections in his lower back for pain caused vomiting and "the shakes," and he subsequently refused further injections. *Id.* at 312. He also testified that he alternated sitting and walking and he used a cane

"most of the time." *Id.* at 310. He further testified that he had to recline for about an hour after standing for too long. *Id.* at 311-12. His daily activities included recycling old computers for charity, picking his children up at school, grocery shopping aided by a clerk, and preparing dinner with the aid of his children. *Id.* at 293-94, 301-02, 306. He testified he could walk up to a block and could read the newspaper for about ten minutes before losing his concentration. *Id.* at 315-19.

A vocational expert also testified at the hearing. *Id.* at 322-26. The vocational expert submitted a summary of the claimant's past relevant work. *Id.* at 323, 141-44. The vocational expert was asked to assume a hypothetical situation wherein, in spite of medically determinable impairments, a claimant could lift and carry objects weighing up to 20 pounds occasionally, 10 pounds frequently; sit (with normal breaks and meal period) about 6 hours within an 8-hour workday; stand and/or walk (with normal breaks and meal period) about 6 hours within an 8-hour workday; and occasionally perform postural activities including crouching and crawling, but should avoid climbing ladders, ropes, and scaffolds, as well as working with dangerous equipment or machinery; and avoid concentrated exposure to vibration. *Id.* at 323. The vocational expert was further instructed to assume that mentally, the claimant was unable to sustain concentration for extended periods, but able to do routine unskilled work under ordinary supervision. *Id.* Given that hypothetical, the vocational expert testified that the claimant could not return to his past work as maintenance-mechanic supervisor or material handler, but that considering his age, education, and past work, as well as his residual functional capacity, the claimant could perform other work in the national economy such as office clerk jobs,

3

cleaning-type jobs, and material handling jobs. *Id.* at 323-25. However, the vocational expert testified that if O'Bryan's testimony were afforded credibility, there would be no work O'Bryan could perform due the difficulties he experienced in concentration as a result of pain management issues. *Id.* at 326.

The record shows that O'Bryan was granted service-related disability compensation by the Department of Veteran's Affairs ("VA") on January 14, 2003. *Id.* at 179-80. At the time of his Compensation and Pension Examination by the VA in December 2002, physician's notes indicate that deep tendon reflexes in both extremities were almost nonexistent and range of motion was limited and produced pain. *Id.* at 280, 180. He exhibited pain and weakness in both extremities. *Id.* The VA physician diagnosed "chronic mechanical low back pain" and "radiculopathy symptoms involving both lower extremities with the left being much worse than the right." *Id.* at 281. An MRI in January 2003 confirmed that O'Bryan had disk disease, showing moderate spinal stenosis at L4-L5, central disc protrusion and mild spinal stenosis at L5-S1, and left L5-S1 neural foramen narrowing. *Id.* The VA's disability determination also notes "current symptoms of neuropathy of the lower extremity secondary to [O'Bryan's] low back condition." *Id.* at 182.

In January 2003, O'Bryan was evaluated and treated at the VA for chronic low back pain that limited his daily activity. *Id.* at 246. An examination by a nurse practitioner in January 2003 noted "no DTRs [deep tendon reflexes] are elicited patellar or Achilles." *Id.* He was referred for physical therapy and to the orthopedic and pain clinics at the VA. *Id.* at 246. On examination, Dr. Jackson Bence, an orthopedic surgeon, found that straight

4

leg raising produced pain in both legs, but more on the left than on the right. *Id.* at 244. Dr. Bence also noted decreased sensation over the L5 dermatome. *Id.* He reviewed O'Bryan's MRI results and noted "MRI does show evidence of spinal stenosis, L4-5, as well as foraminal narrowing at L5-S1 on the left." *Id.* at 244. Dr. Bence stated in April 2003 that O'Bryan had "what appears to be some impingement on the left, possibly the L5 or S1 nerve." *Id.* at 223. He also noted "a little diminished sensation over the great toe on the left, as compared to the right." *Id.* at 222. At that time, O'Bryan's DTRs were "1+ bilateral" and "straight leg raising produces a lot of pain in the hamstrings, some discomfort on the left at about 45 degrees." *Id.* Notes of an anesthesia consultation show that in April 2003 "deep tendon reflexes were diminished in lower extremities bilaterally" and "straight leg raise was negative bilaterally." *Id.* at 221. Dr. Bence referred O'Bryan to vocational rehabilitation and reported in August 2003 that "they consider him unemployable." *Id.* at 204.

Dr. Bence ordered physical therapy as well as a back support and back brace. *Id.* at 205, 217. O'Bryan received several epidural injections for pain. *Id.* at 203, 210, 221. O'Bryan reported temporary relief from injections in February and March 2003, but later reported that the epidural steroid injection worsened his pain. *Id.* at 312. O'Bryan also reported temporary relief from a Decadron burst [2] prescribed by a neurologist. *Id.* at 230, 232-34.

---

[2] A Decadron burst refers to a short course of high doses of oral steroid.

Conventional radiographs and an MRI in September 2003 showed "mild circumferential disk bulges at L4-5 and L5-S-1 with a small superimposed focal protrusion at L5-S1" that was "contiguous with the nerve roots." *Id.* at 201. The radiologist's report indicated that a "clinical correlation should be performed to determine the significance of the small focal protrusion involving L5-S1." *Id.* Physician's notes of an examination by a neurosurgeon in November 2003 noted that O'Bryan's gait was slightly antalgic and he walked with a cane. *Id.* at 195. An examination by a physician's assistant showed "no Babinski or clonus noted and DTRs were 2+." *Id.* On examination, the neurosurgeon, Dr. Arun-Angelo Patil found that O'Bryan was not a candidate for surgery. *Id.*

Physical therapy notes indicate that O'Bryan was a motivated patient. *Id.* at 239. He was treated with traction, exercises, heat and a TENS unit. *Id.* at 230-39, 242. He was instructed to avoid sitting and bending. *Id.* at 231. He reported initial improvement in February and March 2003 contemporaneously with the administration of a Decadron burst. *Id.* at 232. In March 2003, O'Bryan told the physical therapist his left lower extremity felt cold. *Id.* at 227. In mid-March 2003, physical therapy notes indicated that both the patient and the therapist "feel the back is not improving." *Id.* at 236.

R. Cohen, M.D., a Social Security Medical Consultant, submitted a case analysis and completed a Residual Functional Capacity Assessment on Oct 20, 2003. *Id.* at 150-59. He noted "[e]xam of low back shows mild tenderness, no paraspinal spasm, negative straight leg raising, essentially normal ROM . . . no weakness, variable mild sensory deficit at L-5, DTRs 1+ and =, normal gait." *Id.* Stating that there were "no medical source

6

statements in file relevant to back and shoulder impairments," he concluded that "[a]s far as the low back is concerned, the impairment is severe but does not meet listings." *Id.* at 159. He concluded that the patient's credibility was suspect, stating "[h]e claims markedly decreased ADLs [activities of daily living], yet goes camping." *Id.* He found that O'Bryan had the following exertional limitations: he could occasionally lift 20 pounds and frequently lift 10 pounds; he could stand or walk about 6 hours in a normal workday; he could sit for about 6 hours in a normal workday, could occasionally climb stairs, and had no limitation on pushing or pulling. *Id.* at 151-52. Glen D. Knosp, M.D., affirmed Dr. Cohen's RFC assessment on February 13, 2004, noting "2.4.04 - follow-up - not taking anything for low back pain, bothered by depression since quitting anti-depressants." *Id.* at 176.

O'Bryan has also been treated for mental illness. Primary-care physicians' diagnoses included depression beginning in January 2003. *Id.* at 246. In February 2004, he was examined by a psychiatrist, Dr. Ashan Naseem, who diagnosed depressive disorder due to chronic backache. *Id.* at 276. Dr. Naseem noted a mild impairment in recent recall. *Id.* Dr. Naseem rated O'Bryan's global assessment of functioning (GAF) at 50. Dr. Naseem prescribed Ritalin "as a result of the patient having failed two trials of an SSRI and one of Effexor." *Id.* Later that month, O'Bryan reported that he could not tolerate Ritalin and Dr. Naseem then prescribed Celexa. *Id.* at 275. In March 2004, O'Bryan complained of significant lethargy and inability to tolerate Celexa. *Id.* at 274. Dr. Naseem noted that O'Bryan "appeared to be significantly psychomotorically retarded, with slow rate and volume of speech and concentration." *Id.* Dr. Naseem diagnosed "major depressive disorder, recurrent and moderate." *Id.* He assigned a Global Assessment of

7

Functioning ("GAF") of 50.[3]  He devised a treatment plan consisting of individual and group therapy and photo-lamp treatments because he found "it had become apparent that the patient has a very low tolerance for various antidepressants including dopamine agonists as well as SSRIs . . . it is likely that he will continue to experience significant side effects form psychotropics as has become evident in the recent therapeutic trials."  *Id.*

O'Bryan was treated in group therapy sessions conducted by a clinical psychologist, Dr. William Keller, Ph. D., and by a certified addictions counselor, Peter Kalita.  *Id.* at 257-59, 267.  O'Bryan also continued to receive counseling at the VA.  As of March, 2005, O'Bryan was continuing treatment for major depressive disorder and alcohol dependence in the Post-traumatic Stress Disorder clinic and the substance abuse treatment clinic at the VA.  *Id.* at 250.

The record contains a letter dated March 23, 2005, expressing the opinions of Dr. Naseem and Mr. Kalita that O'Bryan is totally and permanently disabled.  *Id.* at 250.  Dr. Naseem and Mr. Kalita stated that "[O'Bryan] suffers from significant lethargy and experiences irritability, anxiety, fear and depression.  He states his limited interest, impaired sleep, difficulty in concentrating with some memory loss, and frequent crying spells affect his daily activities."  *Id.*

O'Bryan was examined by Judy C. Magnusen, Ph. D., a Social Security consulting psychologist, in August 2003.  *Id.* at 183-85.  Magnusen's diagnosis was "[m]ood disorder,

---

[3]The Global Assessment of Functioning (GAF) Scale is a rating system for reporting the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision (DSM-IV-TR) 34 (4th ed. 2000).  A score of 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social occupational or school functioning (e.g., no friends, inability to keep job)".  *Id.* at 34.

due to general medical condition, with depressive features." *Id.* at 185. Her prognosis "for improving his functioning and being able to successfully obtain employment" was guarded, "primarily as a result of his current attachment to the sick role, as well as his understandable difficulty coping with pain." She assessed a GAF of 65.[4] *Id.* Dr. Gonzalez, another Social Security disability medical consultant, reviewed O'Bryan's psychiatric records and performed an evaluation utilizing a form that mirrors the criteria set forth in 20 C.F.R. Ch. 111, Pt.. 404, Subpt. P, App. 1, § 12.00 C, and assesses specific relevant functional factors under Social Security regulations. *Id.* at 160-174. Dr. Gonzalez found that O'Bryan had a mental impairment that was not severe. *Id.* at 160, 163. He found no limitations in areas of restriction of activities of daily living, maintaining social functioning, or episodes of decompensation and only mild functional limitations in maintaining concentration, persistence and pace. *Id.* at 174.

Medical records show that from early 2003 until the date of the hearing on April 5, 2005, O'Bryan had been prescribed Tylenol with codeine, nonsteroidal anti-inflammatory drugs, Tramadol (Ultram), Cyclobenzaprine Hyrocloride (Flexeril), Hydrocodone, Gabapentin (Neurontin), Venlafaxine (Effexor), Citalopram (Celexa), a Lidocaine patch, Ritalin, amitriptyline (Elavil) and selective serotonin re-uptake inhibitors (SSRIs) for pain and depression. *Id.* at 203, 205, 212, 247, 253, 256, 275-76, 278.

The ALJ found that O'Bryan had one or more severe impairments, including discogenic and degenerative disorders of the back, and affective disorder. *Id.* at 16, 21-22. She further found these impairments, singly or in combination, were not equal or equivalent

---

[4] A GAF of 65 indicates some mild symptoms. DSM-IV-TR at 34.

9

to a presumptively disabling condition, as found in the Listings of Impairments, 20 C.F.R. Part 404, Subpt. P, App. 1. *Id.* at 16, 22. Although the ALJ determined that O'Bryan could not return to his former work because of certain exertional and nonexertional limitations, she found that O'Bryan possessed the residual functional capacity for other work that exists in the regional and national economies in significant numbers. *Id.* at 21-22. In assessing O'Bryan's credibility, the ALJ found "there is nothing in file to show these conditions are so severe as to preclude the claimant from all full-time work activity." She based her credibility assessment on the inconsistency between O'Bryan's activities and complaints of constant pain and the fact that "he takes no medication for pain." *Id.* at 18. The ALJ discounted O'Bryan's subjective complaints because "objective findings have failed to substantiate the intensity and persistence of his symptoms." *Id.* In discounting O'Bryan's complaints of disabling depression, the ALJ noted that he had not been compliant with his treatment regimen for depression. *Id.* at 19.

## II.  DISCUSSION

### A.  Law

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support a decision." *Cox v. Apfel*, 160 F.3d 1203, 1206-07

(8th Cir. 1998). In determining whether the evidence in the record is substantial, the court must consider "evidence that detracts from the [Commissioner's] decision as well as evidence that supports it." *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a) (1998); *Cox,* 160 F.3d at 1206. Under the Commissioner's regulations, the determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and his or her age, education and work experience. 20 C.F.R. § 404.1520(a); *Flanery v. Chater,* 112 F.3d 346, 349 (8th Cir. 1997). The Commissioner determines: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. *Cox*, 160 F.3d at 1206.

At step three of the sequential evaluation, if the claimant is found to suffer from an impairment that is listed in the Appendix to 20 C.F.R. Part 404, Subpart P ("the listings") or is equal to such a listed impairment, the claimant will be determined disabled without consideration of age, education, or work experience. *Flanery,* 112 F.3d at 349; 20 C.F.R.

§§ 404.1525(a). The listings specify the criteria for each impairment that is considered presumptively disabling. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In order to be presumptively disabled by reason of a disorder of the spine, a claimant must satisfy the requirements of the criteria for the impairment set forth in section 1.04 of the listings:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 104. To be presumptively disabled by reason of an affective disorder such as depression, a claimant must meet the criteria set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04.

The mental impairment listing consists of a set of medical findings that medically substantiate the mental disorder ("Paragraph A criteria");[5] a set of impairment-related limitations that show effect of the impairment effect on functions deemed essential to work ("Paragraph B criteria"), and certain additional functional limitations ("Paragraph C criteria"). 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A), 12.04; *see generally Pratt v. Sullivan, 956 830,* 834-35 & nn.7&9 (8th Cir. 1992).

---

[5]The finding that a medically-determinable mental impairment exists under Paragraph A must be established by medical evidence consisting of signs, symptoms, and laboratory findings that are gleaned from a mental status exam or psychiatric history. *Id.,* § 404.1520a(b)(1).

12

If a mental impairment is found under Paragraph A, the ALJ must rate the degree of functional limitation resulting from the impairment based on the extent to which the impairment interferes with the claimant's ability to function independently, appropriately, and on a sustained basis in four areas of function which are deemed essential to work.[6] *Id.*, § 404.1520a(c)(3). These areas of activity correspond to the Paragraph B criteria. *Id.* If the Paragraph B criteria are not satisfied, the claimant may prove a listing-level impairment with reference to the Paragraph C criteria.[7] 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A); § 12.04(C)(1)-(3).

If a claimant has a severe physical or mental impairment that does not meet the listing, the Commissioner will then assess residual functional capacity (RFC). 20 C.F.R. § 404.1520a(d)(3). "RFC is defined as 'the most [a claimant] can still do despite' his or her 'physical or mental limitations.'" *Masterson v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004) (quoting 20 C.F.R. § 404.1545(a)). When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating physicians and others. *See Pearsall v. Massanari,* 274 F.3d 1211, 1217-18 (8th Cir. 2001); *see also* 20 C.F.R. §§ 404.1545, 404.1546.

In determining RFC, the ALJ must consider the effects of the combination of both physical and mental impairments. *Baldwin v. Barnhart,* 349 F.3d 549, 556 (8th Cir. 2003); *Cunningham v. Apfel,* 222 F.3d 496, 501 (8th Cir. 2000) (stating that the Commissioner is

---

[6]Those areas are: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The degree of functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform those work-related functions. *Id.,* §§ 404.1520a(c)(4), 404.1520a(d)(1).

[7]The Paragraph C criteria are not relevant to the present case.

13

required to consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling); 20 C.F.R. § 404.1523.

A hypothetical question posed to a vocational expert as part of the RFC determination must precisely set out all the claimant's impairments that are supported by the evidence. *Pickney v. Chater,* 96 F.3d 294, 297 (8th Cir. 1996). The hypothetical question must capture the concrete consequences of a claimant's deficiencies. *Id.* Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision. *Id.* at 296.

When assessing the credibility of a claimant's subjective allegations, the ALJ must consider the claimant's prior work history; daily activities; duration, frequency and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. *Tate v. Apfel,* 167 F.3d 1191, 1197 (8th Cir. 1999) (applying analysis mandated by *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984), to seizure complaints). "'An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'" *Jackson v. Apfel,* 162 F.3d 533, 538 (8th Cir. 1998) (quoting *Porch v. Chater,* 115 F.3d 567, 572 (8th Cir. 1997)). A claimant may have disabling pain and still be able to perform some daily home activities. *Burress v. Apfel,* 141 F.3d 875, 881 (8th Cir. 1998) ("the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.").

It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. *Sims v. Apfel,* 530 U.S. 103, 111 (2000) (noting that "Social Security proceedings are inquisitorial rather than adversarial."). It is well settled that the ALJ's duty to fully and fairly develop the record includes the responsibility of ensuring that the record includes evidence addressing the alleged impairments at issue from either a treating or examining physician. *Snead v. Barnhart,* 360 F.3d 834, 838 (8th Cir. 2004) ("The ALJ possesses no interest in denying benefits and must act neutrally in developing the record"). The duty to develop the record extends to cases where the claimant is represented by counsel. *Snead v. Barnhart,* 360 F.3d at 838. The ALJ's duty to develop the record in a social security hearing may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped. *Smith v. Barnhart,* 435 F.3d 926, 930 (8th Cir. 2006); *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir. 2000) (holding that it was improper for an ALJ to rely on the opinions of reviewing physicians alone).

Under the regulations, "[m]edical source statements are medical opinions submitted by acceptable medical sources . . . about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." Soc. Sec. Ruling 96-5p, 1996 WL 374183. The ALJ is " generally required to request that acceptable medical sources provide these statements with their medical reports." *Id.; but see* 20 C.F.R. § 404.1513(b)(6) (stating that "the lack of the medical source statement will not make the report incomplete").

A treating physician's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

15

evidence" will generally be given controlling weight.[8]  *Reed v. Barnhart,* 399 F.3d 917, 920 (8th Cir. 2005); 20 C.F.R. § 416.927(d)(2).  The treating physician's opinion is given this weight because of his "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 416.927(d)(2).  By contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."  *Kelley v. Callahan,* 133 F.3d 583, 589 (8th Cir. 1998).  In addition, "whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations also provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." 20 C.F.R. §404.1527(d)(2); *see Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000).

Although a disability determination by the Veteran's Administration is not binding on an ALJ in a Social Security case, a VA finding is important enough to deserve explicit attention.  *Morrison v. Apfel,* 146 F.3d 625, 628 (8th Cir. 1998).  A finding of disability by another federal agency is entitled to some weight and must be considered in the ALJ's decision.  *Id.*  (noting that extensive records of a physical exam and a finding of permanent and total disability merit more than simply an implicit rejection); *see also Pelkey v.*

---

[8]The regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairments." § 416.927(a)(2). "Treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source" who provides the claimant with medical treatment or evaluation on an ongoing basis. § 416.902.  By definition then, the controlling weight afforded to a "treating source" "medical opinion" is reserved for the medical opinions of the claimant's own physician, psychologist, and other acceptable medical source.  The opinions of other medical professionals, though not "treating sources" as defined in the regulations, can be afforded treating source status if associated with a physician, psychologist, or other acceptable medical source as part of a team approach to treatment.  *See Shontos v. Barnhart,* 328 F.3d 418, 426 (8th Cir. 2003) (giving treating source status to the group of medical professionals, including therapists and nurse practitioners who worked with claimant's psychologist, where the treatment center used a team approach).

16

*Barnhart,* 433 F.3d 575, 579 (8th Cir. 2006) (noting the distinction between rejecting a VA disability rating after consideration and discussion and simply ignoring it).

### B. Analysis

In denying O'Bryan's claim, the ALJ discredited his subjective complaints of severe back pain. Although the ALJ quoted the *Polaski* standards for evaluation of subjective complaints, it does not appear that she applied them. The record does not support the ALJ's conclusion regarding the frequency and severity of O'Bryan's pain and the intensity of his depression. The ALJ found that O'Bryan's daily activities conflicted with his physical and mental complaints. She relied on the facts that O'Bryan has a valid driver's license, prepares meals, shops for groceries, drives to pick up his teen-aged children at school and helps them with homework, and walks one block to his brother-in-law's house. Those activities are not inconsistent with severe pain. Moreover, the evidence shows that these activities are limited by O'Bryan's pain. He testified, and his wife corroborated, that he needs help preparing meals and shopping for groceries. The ALJ's opinion contains no discussion of the type, dosage, effectiveness, and side effects of O'Bryan's medications, nor any discussion of the location, duration, frequency and intensity of O'Bryan's pain or depressive episodes.

Objective medical evidence supports O'Bryan's testimony about the frequency and severity of pain. The record shows that O'Bryan has consistently reported intense pain to health care providers. MRI and X-ray evidence in 2003 and 2005 shows that O'Bryan has L4-L5 moderate spinal stenosis, circumferential disk bulges at L4-L5 and L5-S1, with a focal protrusion at L5-S1, and left foraminal narrowing. Neurological exam findings showed abnormal deep tendon reflexes. O'Bryan has been prescribed a TENs unit, a lumbar

support, a back brace, numerous medications, and lumbar epidural steroid injections for pain. Moreover, the record shows that any reluctance to adhere to a prescribed regimen of medication was due either to lack of efficacy of the drugs or to O'Bryan's inability to tolerate the medications.

Further, the record supports a finding that O'Bryan had a medically- determinable mental impairment. The ALJ's determination that O'Bryan is "unable to sustain concentration of extended periods, but is able to do routine work unskilled work under ordinary supervision" was based only on a consulting psychiatrist's review of medical records. The ALJ did not consider or discuss the opinions of O'Bryan's treating psychiatrist and counselor. The ALJ discredited O'Bryan's testimony with respect to depression because she found that O'Bryan had not complied with prescribed treatment. The record does not support that contention. The record shows that O'Bryan fully complied with his physicians' prescribed treatment of counseling and psychotherapy. O'Bryan's treating psychiatrist found that O'Bryan was not able to tolerate the psychotropic medications ordinarily prescribed to treat depression.

The ALJ also failed to properly develop the record with respect to O'Bryan's physical impairments. Her determination that O'Bryan had a severe impairment that did not meet the listings and that O'Bryan retained the RFC to work was based solely on the opinion of a consulting physician who reviewed O'Bryan's medical records. In his opinion, the consulting physician conceded that O'Bryan's records did not contain medical source statements from his treating physicians. Under the circumstances, the ALJ should have obtained those statements. Also, in assessing O'Bryan's credibility, the reviewing physician placed inordinate emphasis on a lone reference to a camping trip in the record,

18

without an evaluation of substantial record evidence that substantiates O'Bryan's subjective complaints.

The consulting physician's conclusion that O'Bryan's impairment was severe but did not meet the listings was based on isolated and contradictory facts in the record that were taken out of context. Based on his review of the records, the consulting physician concluded that O'Bryan had mild disc disease and essentially normal nerve function and range of motion. To the contrary, the record contains evidence of nerve root compression characterized by the neuro-anatomic distribution of the pain, limitation of the range of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight-leg raising tests. Neither the consulting physician nor the ALJ gave any reasons for ignoring that evidence. Further, the consulting physician had not seen the records of O'Bryan's disability examination at the VA. The evidence in those records would have substantiated an impairment of listing-level severity.

Because substantial evidence supports the conclusion that O'Bryan could not return to his former work, the burden is on the Commissioner to prove that there are jobs in the economy that O'Bryan can perform. The Commissioner did not meet that burden. The record evidence does not support a conclusion that he retains the residual functional capacity to perform work that exists in the national economy. The ALJ's failure to include O'Bryan's complaints of pain and his mental impairments in the hypothetical questions posed to the vocational expert rendered those questions defective. O'Bryan's significant back pain and depression are supported by the record and O'Bryan was entitled to have the vocational expert consider those impairments. Also, the vocational expert and the ALJ should have considered O'Bryan's physical and mental in combination.

If the record presented to the ALJ contains substantial evidence supporting a finding of disability, a reviewing court may reverse and remand the case to the district court for entry of an order granting benefits to the claimant. *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir. 1984). In this case, O'Bryan has been consistently diagnosed with severe impairments since 2003. Under the circumstances, further hearings would merely delay benefits; accordingly, an order granting benefits is appropriate. *Id.* Accordingly,

IT IS HEREBY ORDERED:

1. The decision of the Commissioner is reversed; and

2. This action is remanded to the Commissioner with instructions to award benefits.

DATED this 14th day of August, 2007.

BY THE COURT:

s/ Joseph F. Bataillon
Chief Judge